314 So.2d 500 (1975)
Dalton G. HODGES
v.
Murray A. DECOTEAU.
No. 10239.
Court of Appeal of Louisiana, First Circuit.
May 19, 1975.
Rehearing Denied July 9, 1975.
Writ Refused September 26, 1975.
*501 Fred H. Belcher, Jr., and Thomas R. Elkins, Baton Rouge, for Dr. Decoteau.
Arthur Cobb, Baton Rouge, for plaintiff-appellee.
L. Todd Gremillion and Brian L. Williams, Baton Rouge for Mr. Hodges.
Before LANDRY, BLANCHE and YELVERTON, JJ.
LANDRY, Judge.
Defendant, Murray Decoteau (Appellant), appeals from a jury verdict judgment awarding plaintiff, Dalton Hodges (Appellee) $60,000.00 damages for breach of an oral profit sharing agreement concerning the operation of several corporations in which the parties were mutually interested. We reverse and render judgment dismissing Appellee's claims.
In essence Appellee asserts a profit sharing agreement in the several corporations involved, coupled with the right to purchase corporate stock. Two prime issues are presented, namely: (1) the terms of the agreement, and; (2) whether the corporation made a profit under Appellee's management.
Appellee, though not a college graduate, is highly skilled and knowledgeable in the fields of chemistry, chemical engineering and the handling and disposal of industrial waste, particularly chemical waste. In late 1965, Appellee conceived plans for establishing an industrial waste disposal operation in the Baton Rouge area and instituted a study to determine feasibility of such a venture. Appellee's interest lay primarily in industrial waste from the numerous chemical plants in the vicinity. From prior experience in the field, Appellee knew that chemical waste could, in some instances, be reclaimed and sold. He also was aware that the supply of such waste was abundant. Appellee's contracts with several industries resulted in his receiving commitments for disposing of their waste.
*502 Lacking funds to finance the proposed operations, Appellee sought investors to provide working capital and funds for equipment purchases. After considerable negotiation, Appellant emerged as the sole investor. It is conceded the parties entered into an oral contract whereby Appellant undertook to provide the required financing and Appellee agreed to structure, operate and manage a waste disposal operation which would be conducted through the medium of one or more corporations. It is also agreed that Appellee would be paid a net monthly salary of $1,000 to supervise, manage and operate the business and would also be furnished a car and be reimbursed for all expenses incurred in the performance of his managerial duties. It is further agreed the businesses were to be conducted through one or more Sub-Chapter S corporations because of the tax advantages that would accrue to Appellant; that Appellee and Appellant would share profits equally; that Appellee would not be responsible for any losses, and; that Appellee would have the right to purchase 50% of the stock in such corporations. The salient issue is the dispute between the parties concerning the terms and conditions of Appellee's stock option privileges.
In essence Appellee contends he was granted unlimited term privileges to purchase stock either for cash or by means of his one-half share of the profits. Conversely, Appellant argues that Appellee was engaged pursuant to an employment contract with a stock option privilege; that Appellee never exercised the option during the period of employment, and; that the business operated at a loss during the entire period it was managed by Appellee.
Pursuant to the agreement, operations were actually commenced in September, 1966. On November 15, 1966, Appellant, an Orthodontist, incorporated Chem Products Service, Inc., (Chem Products). After putting in $1,000.00 capital stock, Appellant received 100% of Chem Products common shares. Prior to Chem Products' incorporation, Appellant advanced Appellee $2,000.00. Subsequent to said incorporation, during November and December, 1966, Appellant advanced Appellee $2,300.00, both of said advances being made out of Appellant's office account.
Operation of Chem Products soon presented a problem with regard to the need for a disposal site for certain chemical waste being handled by that concern. To remedy this complication, on January 1, 1967, Appellant purchased all of the shares of Industrial Waste Disposal, Inc. (Industrial), a competitor corporation, which concern had a disposal area suitable to Chem Products' requirements. At the time of purchase, Industrial had capital stock of $3,000.00 and paid in capital of $10,451.51, which paid in capital was later adjusted in 1967, to reflect an actual value of $11,188.19.
The business began to expand, thus necessitating the purchase of considerable highly specialized, expensive equipment all of which was paid for by advances of Appellant's personal funds to the corporations or from bank loans to the corporations, made available only with Appellant's personal endorsement. To further the operation, Appellant incorporated Seminole Rubber Co., Inc., (Seminole) with a capital stock of $1,000.00 paid by Appellant who received 100% of Seminole's common stock. Subsequently, on August 21, 1969, Appellant incorporated Baton Rouge Disposal, Inc., (Baton Rouge) with capital stock of $1,000.00 advanced by Appellant who was issued 100% of said corporation's common stock.
The several corporations remained under Appellee's exclusive supervision, management and control until July 15, 1969, on which date Appellant terminated Appellee's services. As hereinafter appears, during the time of Appellee's stewardship none of said corporations made a profit but rather, all operated at considerable losses. It is undisputed that during this period, Appellant *503 loaned the several corporations an aggregate of $112,948.89, all paid out of the proceeds of Appellant's Orthodonty practice or revenues available to Appellant.
Following Appellee's discharge, Appellant obtained new management for the operation. In June, 1970 Baton Rouge and Industrial commenced operation with Gulf Disposal, a competitor, pursuant to an arrangement termed an "expense sharing agreement." Appellant had no stock ownership or interest in Gulf Disposal. At the time this arrangement began, Chem Products and Seminole had become dormant and were no longer operated. The expense sharing arrangement with Gulf Disposal did not solve the financial problems which the operation was beset from the beginning. It is shown, however, that subsequent to June, 1970, the status of the venture improved in that annual losses were reduced considerably and in one or two instances a slight profit was realized.
On June 28, 1972, Appellant, as sole owner of Baton Rouge and Industrial, and the owners of Gulf Disposal and another corporation known as Gulf Environmental Services, Inc., merged said companies into Nelson Industrial Services, Inc., a wholly owned subsidiary of Browning-Ferris Industries, Inc., (Browning-Ferris), which latter corporation specializes in waste disposal on an extremely large scale. The merger was accomplished by means of a stock transfer wherein the shareholders of Industrial, Baton Rouge, Gulf Disposal and Gulf Environmental exchanged their stock in these corporations for a tax-free equivalent of Browning-Ferris unregistered common stock having a par value of 16 2/3 cents per share. The exchange agreement contained a schedule whereby certain percentages of the Browning-Ferris stock would be registered at specified intervals and further providing that all said stock would be registered by May 1, 1976. In addition to the Browning-Ferris stock, Appellant also received in cash, the estimated amount of his tax liability resulting from the retained earnings in Industrial and Baton Rouge at the time of the merger. Appellant received 24,563 shares of Browning-Ferris unregistered common stock. At this time, Browning-Ferris registered common stock was quoted on the open market at $31.50 per share. On October 1, 1972, Browning-Ferris registered 20% of Appellant's unregistered shares. Pursuant to said registration Appellant sold 2,000 Browning-Ferris shares for approximately $59,000.00. Since said initial registration, no further portion of Appellant's Browning-Ferris shares have been registered. On the date of trial Browning-Ferris registered shares were quoted on the open market at $8.75. At this time, Appellant still held 22,563 shares of Browning-Ferris stock which could not then be sold because they were either unregistered or had not been sold within government time limitation imposed for the sale of previously registered securities.
Appellee instituted this proceeding July 31, 1973, more than 4 years following his discharge by Appellant. Concerning his stock option agreement, Appellee's petition contains the following pertinent recitations:

"3.
* * * defendant would supply the initial capital for them to start with the proviso that plaintiff would reimburse defendant for one-half of the paid in capital plus 7% interest from the time it was put up to the time it was reimbursed."

"5
* * * the stock of the corporations would be divided equally when plaintiff paid in his one half of the paid in capital."
Also indicative of Appellee's position regarding his stock purchase privileges, are the following assertions contained in a memorandum filed in support of Appellee's *504 motion for summary judgment made in the court below:
"It was agreed that if the businesses were successful ventures, plaintiff would be entitled to share in the profits via the device of a stock option for 50% of the stock.
* * * * * *
Plaintiff was to have the option to buy 50% of his (Appellant's) stock.
* * * * * *
Thus, Plaintiff was given the option to purchase one-half of defendant's stock in Industrial Waste Disposal, Inc., Baton Rouge Disposal, Inc., and Seminole Rubber, Inc.
* * * * * *
The stock of the corporation, however, was issued to the defendant, with the understanding, pursuant to the contract, that at a subsequent date Plaintiff would have the right to become owner of one-half of the stock.
* * * * * *
Plaintiff was to get his one-half only through the device of the stock option.
* * * * * *
and the method of Plaintiff's participation in the profits of this joint venture would be via the device of the stock option granted by Defendant.
* * * * * *
the Plaintiff would have the right and option to buy fifty per cent (50%) of this stock from the Defendant."
In the Statement of Undisputed Facts attached to Appellee's motion for summary judgment, Appellee avers:
"Plaintiff was to pay to defendant one-half of the amount of the initial capital that defendant put into the corporation before one-half of the stock would be put in his (Appellee's) name."
Appellee concedes that he has never offered to purchase for cash any stock in any of subject corporations. Appellee also concedes that his claim to stock, and thus a share in the businesses, is based solely on the operation of Industrial and Baton Rouge and that he is not concerned with any of the other corporations created by Appellant.
Throughout this entire proceeding, Appellee made a concerted effort to characterize the oral agreement as an innominate contract, or to show that said agreement could be one of five types of nominate agreements, but need not be specifically classified for Appellee to prevail. The thrust of Appellee's claim is that Appellant deprived Appellee of Appellee's right to 50% of the corporations' profits and also deprived Appellee of Appellee's right to own 50% of the corporations' stock when Appellant did not permit Appellee to receive Appellee's share of the profits received by Appellant in the stock exchange between Industrial, Baton Rouge and Browning-Ferris.
In support of his claim, Appellee makes the following basic charges. First, that Industrial and Baton Rouge operated at a profit during his managerial period and that he is entitled to exercise his option rights to use said funds to purchase whatever amount of stock up to 50%, that his 50% share of the profits will buy in Industrial and Baton Rouge. Secondly, that Appellant fired Appellee when the fruits of Appellee's labors were beginning to accrue to the operation. In this connection it is argued that Appellant's subsequent acquisition of Browning-Ferris stock, which Appellee contends was worth approximately $2 ½ million, is proof of the value of Industrial and Baton Rouge. Thirdly, that such losses as were incurred by Industrial and Baton Rouge under Appellee's management, and resulted primarily from depreciation factors which redounded to Appellant's benefit in that Appellant claimed these losses in offset of Appellant's personal income tax liability. Therefore, according to Appellee, subject corporations actually operated at a profit.
*505 Appellant's position is that Appellee's right to purchase 50% of the corporate stock was in the nature of a stock option associated with Appellee's employment as a corporate officer and manager of the businesses. Appellant concedes that Appellee was accorded the right to purchase up to 50% of the stock of any or all of the corporations as long as Appellee was employed as manager and supervisor, subject to certain conditions. These conditions were: (1) Appellee could purchase for cash at any time; (2) the corporation had to be making a profit; (3) all personal loans made by Appellant to the corporation had to to be repaid and any corporate loans guaranteed by Appellant would have to be modified to relieve Appellant as guarantor thereof; (4) Appellee could apply Appellee's 50% share of corporate profits to the purchase of stock, and (5) the price of the stock purchase would be the book value thereof as reflected by corporate records.
From the pleadings and records it is apparent that the relationship between the parties was neither a partnership nor joint venture inasmuch as both said categories of business association require the parties to share in the losses of the undertaking, if any. LSA-C.C. Article 2814; Terry v. Slidell Refrigeration and Heating, Inc., La.App. 271 So.2d 536; Walker v. Simmons, La.App., 155 So.2d 234. That the parties may have referred to their connection as a partnership does not make the relationship a partnership in the absence of the legal requirement of an agreement to share losses. We agree with Appellee's contention that the name of the agreement is not the decisive factor. The question is did the parties have an agreement and, if so, whether Appellee has established his rights pursuant thereto.
We conclude that Appellee did not own one half of subject corporations. Appellee's testimony concedes that Appellee never had a present vested interest in corporate stock and that his interest was vested in a "future ownership."
We find that Appellee was an employee of the corporations with the right to share 50% of profits earned during Appellee's tenure as manager, and with the additional right to acquire up to 50% of the stock of either or all of the corporations so long as Appellee remained in their employ.
We also find there was no meeting of the minds of the parties concerning the consideration to be paid for stock in the event Appellee exercised his option to buy. We also find that neither party has urged or shown a reasonable position on this crucial issue.
Under the circumstances both parties must be presumed to have intended and agreed to reasonable terms governing Appellee's rights to purchase 50% of the corporate stock. It is settled law that informed and experienced parties do not ordinarily bind themselves to unreasonable inequitable or unjust obligations. Oil Field Supply & Scrap Material Co. v. Gifford Hill & Company, 204 La. 929, 16 So.2d 483; Texaco, Inc. v. Vermillion Parish School Board, 244 La. 408, 152 So.2d 541.
We deem it highly unlikely that Appellant would agree to Appellee's purchase of 50% of the stock of subject corporations by merely reimbursing Appellant 50% of the Capital Stock shown on the corporate records. Appellant loaned huge sums to the corporations and also advanced considerable sums as paid in capital or capital surplus. Industrial was purchased by Appellant for $22,500.00, at which time said corporation's capital stock was $3,000.00 and its paid in capital was $10,451.51. Under such circumstances we conclude it is highly unreasonable to find that Appellant would agree to sell stock on the terms contended by Appellee.
Appellant's version that stock purchase value was predicted upon book value *506 appears equally unreasonable from Appellee's standpoint. Such a standard would include elements of value not attributable to the capital advanced by Appellant, namely, that portion of the book value attributed directly to Appellee's managerial ability. We find that the most reasonable interpretation of the agreement is that the parties intended Appellee's purchase rights were such that acquisition of up to 50% of corporate stock was to be predicated upon payment of up to 50% of the total stock-holder equity in the corporations, which consists of the corporate value attributed to capital stock and paid in capital. Pursuant to such a valuation, Appellant's loans would form no part of the stock valuation.
We find the instant cases analogous to that of Terry, above, and Whitmeyer v. Poche, La.App., 49 So.2d 69, in each of which cases a contract of employment was coupled with the right to share in profits. The rule applicable in such cases is that a contract of employment for an indefinite period is terminable at the will of either party. Pechon v. National Corp. Service, Inc., 234 La. 397, 100 So.2d 213; Graham v. Magnolia School, La.App., 286 So.2d 706. Appellee was terminated on July 15, 1969. This ended Appellee's right to further salary as an employee. It also concluded Appellee's right to share profits earned after said date, and terminated his stock option as well.
Appellee's rights to share in the profits of Industrial and Baton Rouge are limited to the profits earned by said corporations, if any, from date of incorporation or acquisition to July 15, 1969.
Appellee offered in evidence copies of Federal Income Tax Returns submitted on behalf of Industrial for the calendar years 1967, 1968 and 1969 and returns for Baton Rouge for the fiscal year August 21, 1968, to June 30, 1969. These returns show that during 1967, 1968 and 1969, Industrial sustained losses of $14,902.67, $57,049.33, and $5,559.57, respectively and that Baton Rouge reported a loss of $15,026.80 for the fiscal period August 1, 1968, to June 30, 1969.
Appellee suggests that the net taxable income (losses) reported by the corporations for the periods in question, do not reflect their true profit-loss condition because the returns also show substantial increases in assets during these intervals and also because considerable depreciation was taken as deductions from gross income. It is noteworthy that the principal assets depreciated were land improvements and trucks, some of which vehicles were highly specialized equipment. A certified public accountant appearing on behalf of Appellee explained that the depreciation taken was a normal legitimate business deduction in determining net income. He also explained that the straight line method of depreciation was used and that this method resulted in no particular advantage to the taxpayer. The returns further show that a total of $61,669.37 was taken in depreciation during these periods in which subject corporations sustained aggregate losses of $92,618.86. Assuming the claimed depreciation were eliminated from consideration, the returns show that subject corporations still sustained losses of approximately $30,000.00 under Appellee's management.
Further analysis discloses that Industrial commenced the period in question with assets of $37,316.41, which figure was adjusted in 1968, to reflect an additional $27,233.04 which produced a total of $64,549.45 in assets as of January 1, 1967. The adjustment was to show the true value of land acquired and improvements made thereon in 1966. As of December 31, 1969, Industrial showed total assets of $166,750.31, a net increase of $102,200.86 as of that date. However, Industrial commenced this period with only $24,000.00 in loans and notes liabilities but ended the period with loans and notes liabilities aggregating $205,963.94, of which sum $95,334.33 was loaned to Industrial by Appellant individually. It is readily evident that the increase *507 in assets during the period under discussion is not attributable to retained profits but rather the result of borrowed funds. During the period in question, Baton Rouge acquired assets of $29,050.81 but also incurred loan obligations totalling $43,459.19. Since none of the increases in assets were produced by profits earned by Appellee as manager, Appellee has no right to share therein.
We likewise find that Appellee is not entitled to share in the Browning-Ferris stock received by Appellant in the merger-stock exchange of June 28, 1972, three years after Appellee's dismissal. Subsequent to Appellee's discharge, Appellant continued to operate Industrial and Baton Rouge and also continued to advance large sums to these corporations or procure loans by means of Appellant's personal endorsement of notes. From July, 1969, to June, 1972, the condition of Industrial and Baton Rouge improved slightly in that losses were reduced and in some instances a small profit was realized. Our review of the record convinces us that the merger of 1972, was Appellant's method of resolving a financial disaster. It was a salvage operation in which Appellant sought in effect to obtain payment for the vast sums advanced these corporations. Appellant accepted unregistered stock of questionable future value because it was not marketable at the time of receipt. As Appellant explained, it was a gamble that the Browning-Ferris stock would either retain its then market value or increase in value by the time it became marketable. The record shows, however, that this stock has steadily declined in value.
We are mindful of the rule that an appellate court should not disturb a jury finding a fact save in a case of manifest error. Nevertheless, where such error appears, it is the duty of the reviewing tribunal to set such a verdict aside. Zappala v. Liberty Mutual Insurance Co., La.App., 278 So.2d 904.
In this instance we find that the jury has manifestly erred in both its factual findings and its application of the law to the facts of this case.
It is ordered, adjudged and decreed that the judgment in favor of plaintiff Dalton Hodges against Murray Decoteau be and the same is reversed, annulled and set aside, and judgment rendered herein in favor of defendant Murray Decoteau and against plaintiff Dalton Hodges, rejecting said plaintiff's demands, with prejudice, all costs of these proceedings to be paid by plaintiff Dalton Hodges.
Reversed and rendered.