425 So.2d 847 (1982)
Daniel CUPIT, Sr., as the sole surviving parent, and Administrator of the Estate of his child, Terry Dale Cupit, Plaintiff-Appellant,
v.
Louis Neal GRANT, et al., Defendants-Appellees.
No. 82-448.
Court of Appeal of Louisiana, Third Circuit.
December 22, 1982.
Rehearing Denied February 4, 1983.
*848 Roy S. Halcomb, Jr., of Broussard, Bolton & Halcomb, Alexandria, and Roy S. Halcomb, Sr., Ferriday, for plaintiff-appellant.
Charles S. Norris, Jr., Jonesville, Davenport, Files, Kelly & Marsh, Thomas W. Davenport, Jr., Monroe, Theus, Grisham, Davis & Leigh, J. Bachman Lee, Monroe, for defendants-appellees.
Before GUIDRY, CUTRER and STOKER, JJ.
CUTRER, Judge.
This appeal emanates from a death action and a personal injury suit wherein the trial court granted motions for a directed verdict filed by Louisiana Delta Plantation and other defendants on the ground that Louisiana Delta was neither employer of, nor a joint venturer with, Louis Grant (tort feasor), at the time of the fatal automobile accident.
On June 21, 1976, a pickup truck driven by Grant crossed the centerline of the highway and collided head-on with an automobile driven by Edward L. Youngblood. Two of the occupants of the Youngblood automobile were Terry Dale Cupit (minor) and his mother, Charlotte Anne Buckles Youngblood. The minor Cupit was seriously injured and Mrs. Youngblood was killed.
This suit was filed by Daniel Cupit, Sr. (plaintiff), individually and as the duly qualified provisional tutor of his minor children, Daniel Cupit, Jr., Terry Dale Cupit and Sherry Gayle Cupit. Daniel Cupit, Sr., was formerly married to Mrs. Youngblood. The three children were born of this marriage. Cupit and his wife divorced and custody of the children were awarded to the wife who later married Edward Youngblood. Recovery was being sought for the general and special damages resulting from the injuries sustained by Terry Dale Cupit and for the wrongful death of the mother of Terry Dale, Daniel, Jr., and Sherry Gayle Cupit.
In addition to the drivers of the two vehicles, Grant and Youngblood, Louisiana Delta Plantation, Morrison Grain Company, *849 Inc., Morrison-Quirk Grain Corporation, the Aetna Casualty & Surety Company (Aetna) were named defendants. Louisiana Delta Plantation is a joint venture made up of two foreign corporations, Morrison-Quirk Grain Corporation and Morrison Grain Company, Inc. We will refer to these defendants as Louisiana Delta. Aetna was their liability insurer.
Louisiana Delta was sued as the alleged employer of Grant or, alternatively, as a joint venturer, with Grant.
This was a jury trial and at the close of plaintiff's case the trial court granted motions for a directed verdict filed by Louisiana Delta and Aetna dismissing plaintiff's suit as to these parties.[1] Plaintiff appeals. We amend and affirm in part and reverse and remand in part.
The issues on appeal are:
(1) Whether the trial court erred in granting Louisiana Delta's and Aetna's motions for a directed verdict on the ground that Grant was a lessee of Louisiana Delta (referred to as Morrison Companies by the trial judge) and was neither an employee nor a joint venturer with Louisiana Delta; and
(2) Adequacy of awards.

MOTIONS FOR A DIRECTED VERDICT
As we approach this issue we must keep in mind the standard to be used in deciding a motion for a directed verdict in a jury case. This standard is set forth in the case of Campbell v. Mouton, 373 So.2d 237 (La.App. 3rd Cir.1979), as follows:
"On Motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidencenot just that evidence which supports the non-mover's casebut in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury."
It is plaintiff's position that the contract between Grant and Louisiana Delta establishes, not a lessee-lessor relationship, but one of employee-employer thereby creating a vicarious liability of Louisiana Delta for the negligent acts which occurred during the course and scope of Grant's alleged employment. In the alternative, plaintiff contends that the relationship between Grant and Louisiana Delta was that of a joint venture.
We must keep in mind that a directed verdict can be granted only if the facts and inferences point so strongly and overwhelmingly in favor of one party (Louisiana Delta and Aetna) that the court believes that reasonable men could not arrive at a contrary verdict.
The trial court, at the close of plaintiff's case, granted the motion for a directed verdict holding that the relationship between Louisiana Delta and Grant was that of lessee-lessor and not as an employer-employee or as joint venturers. The trial court gave the following reasons in this regard:

"... The relationship that existed between Grant and the Morrison Companies was one of lessor-lessee and not an employee-employer relationship. In fact, Grant had other leases from other persons at the time of this accident. Grant also had a farming operation on land that he personally owned. Grant had to produce a profitable crop in order to realize any monetary profit. There were no *850 wages paid to him by the Company. Grant had to bear his own loss. In fact, he lost money on his crop. Plaintiff points out that the lease agreement contains several provisions, which upon reading might indicate that the Morrison Companies exercised some degree of control over the tenants; however, I feel that this was adequately explained by the testimony of the Company manager, Mr. Norman Haigh, who explained in effect that this simply provided for services afforded the tenants by the Company to insure good farming practices so that the lease undertaking would stand a better chance of being profitable to both the lessee and the lessor."

* * * * * *
"... This is a novel idea advanced by plaintiff, but has little or no merit. There were absolutely none of the requirements of a joint venture in the legal relationship that existed between Grant and the Morrison Companies. There was nothing to manifest an intent between the parties to create a joint venture, equal control did not exist between the parties, there was nothing to indicate a sharing of losses. In fact, the Company could profit and the farmer could sustain a loss. There was no indication of a proprietary interest."
We disagree with the trial judge's conclusion that reasonable persons could not possibly have arrived at a conclusion that would favor the plaintiff, even though all inferences were resolved in favor of the plaintiff.
In making a determination of whether an employee-employer relationship exists, an important factor is the element of control or supervision over an individual. In the case of Savoie v. Fireman's Fund Ins. Co., 347 So.2d 188 (La.1977), the court stated:

"In determining whether an employment relationship exists in other contexts, the jurisprudence of this state has uniformly held that the most important element to be considered is the right of control and supervision over an individual. Hickman v. Southern Pacific Transport Co., 262 La. 102, 262 So.2d 385 (1972); Blanchard v. Ogima, 253 La. 34, 215 So.2d 902 (1968). Factors to be considered in assessing the right of control are the selection and engagement of the worker, the payment of wages and the power of control and dismissal. Dauzat v. Crites, 237 So.2d 697 (La.App. 4th Cir. 1970); Wambles v. State, 283 So.2d 331 (La.App. 4th Cir.1973); Trahan v. State, 158 So.2d 417 (La.App. 3d Cir.1963)."

Control by each party in a joint venture is also an important factor to be considered. In the case of Marine Services, Inc. v. A-1 Industries, 355 So.2d 625 (La. App. 4th Cir.1978), the court stated as follows:

"There are three major requirements for the existence of a joint venture or partnership to be found. First, all the parties must consent to the formation of a partnership. C.C. art. 2805. Second, there must be a sharing of the losses of the venture as well as the profits. C.C. Arts. 2811, 2813, 2814. And last, each party must have some proprietary interest in, and be allowed to exercise some right of control over, the business. Westenberger v. State, Dept. of Education, 333 So.2d 264 (La.App. 1st Cir.1976); Vignes-Bombet Co., Inc. v. Rowe, 288 So.2d 889 (La.App. 1st Cir.1973); Roberson v. Maris, 266 So.2d 488 (La.App. 4th Cir.1972); Hauth v. Iacoponelli, 251 La. 410, 204 So.2d 767 (1967)."

We now turn to the record to determine if a directed verdict was proper under the circumstances, or whether these two issues (employee-employer or a joint venture) should have been presented to the jury for determination.
Louis Grant began farming land owned by Louisiana Delta in 1970. This farming was done according to annual agreements entered into by the parties. We are concerned with the agreement entered into for the year of 1976, as this accident occurred on June 21, 1976. The instrument in question is entitled "Surface Lease From Louisiana *851 Delta Plantation to Neal Grant." (Grant's full name is Louis Neal Grant.) The acreage leased was 890 acres. The terms of the instrument in question extended from January 1, 1976, through December 31, 1976. In 1976, Grant was farming land owned by himself, by other persons and the Louisiana Delta lands.
In consideration for the contract Louisiana Delta was to receive one-third of all crops grown and harvested by Grant. The cost of seed, fertilizer, insecticides and herbicides was to be shared one-third by Louisiana Delta and two-thirds by Grant. The application costs of these were to be borne by Grant.
The instrument required Grant to farm the land in keeping with the farm practices for the cultivation of crops in the locality of the property. Louisiana Delta reserved the right to determine whether a government crop control program would be accepted or conformed to. Louisiana Delta also reserved the right to select the variety of the seed to be used by Grant. Grant agreed to furnish ample equipment and labor to farm and harvest the premises.
The instrument, in Section XVI, provided as follows:
"Supervision and Control by Lessor
"Lessor retains full supervision and control of the manner and time for plowing, planting, cultivation, fertilizing, poisoning and harvesting of all crops grown, and the failure of Lessee to properly control noxious weeds or to submit to Lessor's supervision and control of the crops grown shall ipso facto terminate this lease and relieve Lessor of any responsibility or liability to Lessee.
"It is agreed and understood that nothing contained herein shall have the effect of making Lessee an agent or employee of Lessor and nothing herein shall be interpreted to permit Lessor to supervise either Lessee's employees, servants or Lessee in respect to the time and manner in which Lessee's machinery or labor is operated or their duties performed except during any period when Lessee is in breach of his obligations under this lease."
The extent of control and supervision over Grant by Louisiana Delta is unclear, both from a reading of the instrument and the circumstances presented by the record. Section XVI above, first paragraph, reiterates "[f]ull supervision and control" over all principal aspects of a farming operation. Grant testified that the words "[p]lowing, planting, cultivation, fertilizing, poisoning and harvesting" generally encompasses an entire farm operation. Norman Haigh, the general manager for Louisiana Delta, stated that the purpose of the provision was to provide Louisiana Delta with authority to terminate the lease and farm any land which the farmer failed to farm.
We conclude that, after a review of the provisions of the instrument, in light of the circumstances presented, reasonable and fair-minded persons may reach different conclusions as to the relationship between Louisiana Delta and Grant; i.e., whether the relationship was that of lessee-lessor, employer-employee or that of joint venture.
The meaning of this Section XVI is and must be interpreted by the trier of fact, the jury. For the trial court to interpret the provisions of the instrument, in light of the circumstances presented, is an invasion of the province of the jury. All issues in a jury case must be presented to and decided by the jury.[2]
We want it clearly understood that we are making no determination of the relationship between Grant and Louisiana Delta. We are only making a determination that, under the circumstances presented, such issues should have been presented to and decided by the jury. The trial court committed manifest error in making this *852 determination on a motion for a directed verdict.
These defendants were dismissed from the suit at the close of plaintiff's case. They participated no further in the trial. Under these circumstances we must reverse the judgment granting the motions for a directed verdict and remand the suit for a new trial as between the plaintiff and these defendants, Louisiana Delta Plantation, Morrison Grain Company, Inc., Morrison-Quirk Grain Corporation and Aetna Casualty & Surety Company. Judgment was rendered against Grant and he has not appealed. Thus the judgment has become final as to him.

ADEQUACY OF AWARDS
Plaintiff, on appeal, seeks an increase in the awards that were granted against Grant. We now proceed to dispose of this issue. The general damage award for injuries received by Terry Dale Cupit and the wrongful death awards to each of the three minor children will be discussed separately.

(1) General Damages

The jury awarded nine-year-old Terry Dale Cupit $300,000.00 in general damages and $5,724.06 for stipulated medical damages. Terry Dale sustained a number of injuries in this accident.
Dr. Ronald K. Tischler, the attending physician, stated that Terry Dale was comatose and in moderate respiratory distress when he operated. Dr. William McBride, an internal medicine expert, also attended Terry Dale on the day of the accident and stated that the child experienced "shock lung syndrome." Such a condition describes damage to the small blood vessels in the lung (capillaries) due to lack of oxygen to the blood vessels. Fluid in the lungs often occurs as a result of this damage. Dr. McBride further testified that this type of injury can impair the oxygenation of the brain which, if long enough, can cause brain damage.
Dr. T.E. Brooks, an orthopedist, also treated Terry Dale on the day of the accident. Dr. Brooks stated that Terry Dale had sustained a communited open fracture (opening in the skin where the bone apparently came through the skin) of the femur and a closed fracture of the tibia. Dr. Brooks set the fractures by surgically placing pins in the bone which left a six inch scar on the thigh and caused the child to be nonambulatory for at least ten days.
Terry Dale has experienced what appears to be permanent complication arising from injuries sustained in the accident. Dr. Chester Fresh, a neurosurgeon, treated Terry Dale twenty months after the accident on a referral from Dr. Banks. Dr. Fresh found the child to have sufficient spasticity (sustained contracture of the muscles) from the elbow to the hand to significantly limit the use and function of his right hand. Dr. Fresh also found Terry Dale to have an aspastic walk. Such a condition describes an impairment of the free flowing movement of the arm and leg. With such an impairment, Dr. Fresh states Terry Dale is incapable of walking at a quick pace, climbing, bending, squatting and might later incur back problems in the form of scoliosis (curvature of the spine).
Dr. Fresh stated that these conditions were caused by direct trauma to the head and damage to the cortical motor system of the brain. Dr. Fresh finally stated that further recovery by Terry Dale would be minimal.
Dr. W.P. Culbertson, possessed of a PhD in economics, qualified as an expert in projected future earnings and testified that Terry Dale's expected loss of income would be $563,537.00. Dr. Culbertson considered such factors as unemployment, inflation, Louisiana's average income, work life expectancy, and conservative investments. In awarding Terry Dale Cupit $300,000.00 in general damages the jury apparently did not give great weight to the projections of Dr. Culbertson.
Considering the extent of the injuries and the sum awarded for general damages, we find that the jury's decision is within the much discretion of the trier of fact. This award will not be disturbed on appeal by this court. Reck v. Stevens, 373 So.2d 498 (La.1979).

*853 (2) Wrongful Death Awards

The jury also awarded minors Daniel Cupit, Jr., Terry Dale Cupit and Sherry Gayle Cupit $15,000.00 each for the wrongful death of their mother, Charlotte Ann Buckles Youngblood. Plaintiff also contends this sum is inadequate.
J.O. Buckles, Charlotte Ann's father, testified that Daniel, Jr., Terry Dale and Sherry Gayle had a good relationship with their mother. Daniel Cupit, Sr., first husband of Charlotte Ann and father of the minor plaintiffs, testified that he did not contest Charlotte Ann's custody of the children because she was "a real good mother to them." Daniel, Sr., further testified that Charlotte Ann took the children to church on a regular basis.
Daniel, Jr., was eleven years of age and Terry Dale and Sherry Gayle (twins) were nine years of age at the time of their mother's death. They had an undisputably close relationship with their mother and undoubtedly have and will continue to suffer over their loss.
Upon review of the record regarding the children's relationship with their mother we conclude that the jury abused its discretion in awarding Daniel Cupit, Jr., Sherry Gayle and Terry Dale Cupit $15,000.00 each for the death of Charlotte Ann Buckles Youngblood. Reck v. Stevens, supra; Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977). We believe their award should range from $30,000.00 to $40,000.00.[3] Accordingly, we shall increase the wrongful death award of each of the children to $30,000.00, the lowest point which is within the discretion afforded the jury. Reck v. Stevens, supra; Coco v. Winston Industries, Inc., supra.
For the reasons assigned the judgment of the trial court which awarded Daniel Cupit, Sr., on behalf of the minor children, Daniel Cupit, Jr., Sherry Gayle and Terry Dale Cupit, and against Louis Neal Grant, the sum of $15,000.00 for each child is hereby amended by increasing the sum to $30,000.00 for each child. In all other respects the judgment against Louis Neal Grant is affirmed.
The judgment of the trial court, which dismissed the suit against Louisiana Delta Plantation, Morrison Grain Company, Inc., Morrison-Quirk Corporation and Aetna Casualty & Surety Company, is reversed and set aside. The suit is remanded for a new trial as between plaintiff and these defendants in accordance with the views expressed herein and according to law. The costs of this appeal are to be assessed one-half to Grant-appellee and one-half to the remaining defendants-appellees.
AMENDED AND AFFIRMED IN PART; REVERSED AND REMANDED IN PART.
NOTES
[1] The jury trial continued and a verdict was rendered in favor of plaintiff against Louis Grant as follows:

General Damages for Terry Cupit $300,000.00
To Each Child for Loss of Mother 15,000.00
Medical Expenses 5,724.06

Grant has filed no appeal and judgment against him has now become final.
[2] LSA-C.C.P. art. 1735 provides:

"The trial of all issues for which jury trial has been requested shall be by jury, unless the parties stipulate that the jury trial shall be as to certain issues only or unless the right to trial by jury as to certain issues does not exist; however, except as otherwise provided under the provisions of Article 466, there shall be but one trial."
[3] Faulk v. Schlumberger, etc., 412 So.2d 162 (La.App. 3rd Cir.1982); LeJeune v. Allstate Ins. Co., 373 So.2d 212 (La.App.3rd Cir.1979).