NORRIS, Judge.
This is a suit for an accounting and a distribution of profits arising from an alleged joint venture. The plaintiffs, a Florida corporation called Florida Universal Financial (Florida) and its president, Jerome Burkett, sued a number of people and entities who allegedly entered a joint venture with Florida. Even though the prospective business project was unsuccessful, a lot of money changed hands and Florida, wanting to recoup its losses, demanded an accounting and a share of alleged secret profits. It also wanted a return of its $80,000 “venture capital.” The defendants answered denying that there was a joint venture and contending that under the terms of the letter that constituted the agreement, Florida’s right of recovery was limited to a $40,000 promissory note that had been executed by one of the defendants and endorsed by others. The defendants further claimed that the project never earned any profits in which Florida could share. The defendants also filed numerous reconven-tions and third party demands. After a trial on the merits, the court below dismissed all demands but ordered one defendant to endorse a $40,000 promissory note to Florida. Only Florida appeals. Its six specifications of error can be grouped into three broad arguments:
(1) Whether the trial court erred in holding that there was no joint venture;
(2) Whether, if a joint venture existed, the partners owed fiduciary duties to each other; and
(3) Whether the trial court erred in failing to find that the alleged joint venture produced any profits.
For the reasons expressed, we affirm.
FACTS
The first participants in the alleged joint venture were Bill and Ronald Jones, brothers and general contractors who ran a company called Lee-Bradley Corp. In 1972, they learned about a construction concept called a Planned Unit Development (PUD). A PUD is a kind of self-contained suburb, planned in a logical way and built from the ground up with hundreds of apartment and condominium units, numerous shopping centers, churches, schools, parks and perhaps even a country club. The Jones Brothers thought they could build a PUD on 758 acres in Sarasota, Florida, to be called the Wynnwood PUD. They obtained the necessary options on the land but then ran out of money. They needed additional funds to proceed with the next phase of the project, rezoning the property.
The next participants were defendants W.H. Cox, his business partner Herman K. Beebe, and their company, Estate and Pen *712 sion Consultants, later known as Estate and Financial Consultants (Estate). Cox thought the project had promise because a PUD would make the land value skyrocket. At the time, economic conditions were good and the state of Florida seemed receptive to PUDs. The first order of business, though, was to have the property rezoned. This would require extensive surveying, mapping and environmental impact reports that would cost about $80,000. On September 5, 1972, Estate made an agreement with Lee-Bradley and the Joneses. Cox, Beebe and Estate were to make an $80,000 “loan/investment” for Lee-Bradley to get the property rezoned. Lee-Bradley and Estate were to have an equal say in pursuing the PUD development if the rezoning effort was successful. If it was not successful, Lee-Bradley was to convey a 50% interest in the venture to Estate.[1] To evidence the loan, Lee-Bradley and the Joneses executed a note for $40,000 in favor of Estate. As security for the note, they agreed to pledge any unused portions of the loan/investment, plus any deposits from the options, to Estate (according to Florida, these pledges were never effected). With the $80,000, Lee-Bradley was able to proceed with the rezoning project.
The next participants were the plaintiff, Jerome Burkett, his business partner Joe Schaeffer, and their company, Florida. Florida was in the business of financing and mortgaging. Schaeffer had met Cox on the Shreve Square project and heard about the Wynnwood PUD. Like Cox, he thought the project would be worthwhile and wanted to get in on it. Cox and Beebe[2] extended to Florida an offer to purchase one-half of their potential profit from the project. This offer was dated December 20,1972, and was accepted January 2, 1973. The consideration for the purchase was Florida’s agreement to provide the entire $80,000 for the financing of the rezoning project and its assumption of 100% of Cox and Beebe’s liability under Estate’s earlier agreement with Lee-Bradley. Florida also agreed to hold Cox and Beebe harmless for all obligations arising from the transaction. Cox and Beebe continued to check invoices and distribute money in accord with the August/September 1972 agreement, but they had no stake in the potential losses.
When the zoning board for Sarasota considered the proposed changes, it reached a tie vote, which was not sufficient to effect the change. A reapplication was made, but it apparently never reached a vote. Cox and Beebe grew disenchanted with Lee-Bradley and wanted to get out. On November 17, 1973, they sold to Lee-Bradley their remaining 25% interest in the project for $34,000, payable within 45 days. Bill Jones[3] also agreed to pay off two banknotes unrelated to the Wynnwood PUD, totalling $106,000. Lee-Bradley defaulted, so Cox and Beebe brought suit which they reduced to a default judgment. To satisfy this judgment, Bill Jones individually and as president of Lee-Bradley executed a promissory note for $34,559.66, payable to Beebe and Cox, on April 25, 1974.
Several months later, in August 1974, Cox told Schaeffer that he and Beebe had resold their interest to Lee-Bradley and were no longer involved in the project. At this time he also sent Burkett the entire file, including the $40,000 promissory note of November 15, 1972 and the collateral pledge.
Florida and Burkett[4] brought the instant suit in November 1977. They alleged that Estate, Cox and Beebe had received “secret” profits in the form of the $40,000 note of November 1972, the $34,559.66 note of April 1974, and the $106,000 debt arrangement of November 1973. Florida *713 claimed that these payments were violations of the fiduciary duty the joint ventur-ers owed each other. Florida demanded an accounting, a share of the “secret” profits, and a return of its $80,000 venture capital.
DISCUSSION
Louisiana has no statutory law governing joint venture. The jurisprudence, however, has defined it as “a special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation.” Daily States Pub. Co. v. Uhalt, 169 La. 893, 126 So. 228 (1930). The cases have generally assimilated joint venture to the law of partnership. Daily States Pub. Co., supra; Amer. Fidelity Fire Ins. Co. v. Atkison, 420 So.2d 691 (La.App. 2d Cir.1982). We will therefore refer to the jurisprudence of joint ventures where available, and elsewhere to the law of partnership.
The civil code defines a partnership as “a juridical person, distinct from its partners, created by contract between two or more persons to combine their efforts or resources in determined proportions and to collaborate at mutual risk for their common profit or commercial benefit.” LSA-C.C. art. 2801.
The jurisprudence has broken down this article into component parts. See, e.g., Cajun Elec. Power Co-Op v. McNamara, 452 So.2d 212 (La.App. 1st Cir.1984), writ denied 458 So.2d 123 (La.1984). An excellent summary of these elements is found in Cupit v. Grant, 425 So.2d 847 (La.App. 3d Cir.1982):
There are three major requirements for the existence of a joint venture or partnership to be found. First, all the parties must consent to the formation of a partnership. Second, there must be a sharing of the losses of the venture as well as the profits. And last, each party must have some proprietary interest in, and be allowed to exercise some rights of control over, the business.
425 So.2d at 850 (citations omitted)
See also Marine Services Inc. v. A-1 Industries, 355 So.2d 625 (La.App. 4th Cir.1978), and the citations therein.
We have closely analyzed, in terms of these requirements, the documents that constituted the instant agreement and the alleged joint venture. We find that this agreement fails every requirement.
First is the requirement of consent. In a typical partnership or joint venture, the parties mutually agree to be bound to one another in their business objective. The mutual agreement is usually crucial to the contributions and the allocation of risk. The requirement of mutuality is explicit in LSA-C.C. art. 2801, which requires a contract and its concomitant meeting of minds.
In this case, the alleged joint venture seems never to have been favored with a complete mutuality of consent or meeting of minds. It fails in two ways. First and foremost, there was never any mutual agreement between the three major parties to any transaction. When Lee-Bradley and Estate confected their first agreement in the August/September 1972 documents Florida was not a party. Later, in December 1972 and January 1973, Florida signed a contract with Cox and Beebe alone. Cox admitted that Lee-Bradley did not know about Florida’s interest until later. R.p. 119. Burkett admitted Florida never contracted with Lee-Bradley. R.p. 192. Thus there was nothing of the mutual, three-way agreement that would have been necessary to draw Lee-Bradley, Cox and Beebe, and Florida into a large joint venture.
Florida’s status is rather governed by LSA-C.C. art. 2812 which provides:
A partner may share his interest in the partnership with a third person without the consent of his partners, but he cannot make him a member of the partnership. He is responsible for the damage to the partnership caused by the third person as though he caused it himself, (emphasis added)
By sharing their interest with Florida, Cox and Beebe could not make Florida a partner or a joint venturer. See Freligh v. *714 Miller, 16 La.Ann. 418 (1862); United States v. Atkins, 191 F.2d 951 (5th Cir.1951).
Consent also fails because all the parties seem not to have had the same objective in mind. The purpose of the August/September 1972 agreement between Estate and Lee-Bradley was very limited:
This commitment is written pursuant to your [Lee-Bradley’s] request to [Estate] for financing in connection with the zoning of the captioned parcel of land, which is more fully described in the proposal which you furnished to [Estate].
⅜ sj« * * * ‡
Our loan/investment is to be up to the sum of $80,000, which you are to spend solely for the purpose of obtaining the Sarasota Planning Commission’s zoning approval of this PUD in accordance to your proposal, (emphasis added)
Thus Estate and Lee-Bradley may have intended to enter a joint venture for the limited purpose of getting the zoning change in Sarasota. Later, when Cox and Beebe, Estate’s successors, contracted with Florida, the subject was “total profits” arising out of the agreement and the “development.” The overall tenor of this December 1972/January 1973 agreement makes it clear that Florida’s inducement to enter the transaction was the expected profits on the construction of the PUD, and not merely the profits as to accrue from getting the land rezoned. Florida acknowledges in brief that its objective was the “development of the Wynnwood PUD.” Appellant’s brief, 23. The parties were intending different objects and this is not sufficient to prove a joint venture.
Naturally, if the rezoning attempt had succeeded, then Lee-Bradley could have contracted with Cox and Beebe, and perhaps with Florida, to pursue the complete development of the Wynnwood PUD. In fact, this seems to be the intent of the August/September 1972 agreement between Lee-Bradley and Estate. It provides:
In any event, whether the approval of the PUD is obtained or not, the decision of whether to sell the property “as is” or to go forward with the development shall rest equally with [Estate and Lee-Bradley].
The actual development and construction of the PUD was obviously not contemplated in this original agreement; at best there was an agreement to agree when later the rezoning was either attained or made impossible.
Florida’s rights and duties are derived from the contract that brought it into the transaction. LSA-C.C. art. 1908; LSA-C.C. art. 1945 (repealed). When the parties have manifested their intent by offer and acceptance and for lawful cause, we will honor their contract as the law between them. Fullerton v. Scarecrow Club, 440 So.2d 945 (La.App. 2d Cir.1983). In the December 1972/January 1973 agreement, the parties provide:
We [Cox and Beebe] assign to Florida Universal Financial Corporation, its successors or assigns, one-half (Vfe) (one-half interest defined as twenty-five [25%] per cent of total profits) of W.H. Cox, II’s and H.K. Beebe’s interest in the profits arising out of that certain agreement entered into September 5, 1972, * * *.
Joseph H. Schaeffer, Jr., and/or Jerome Burkett and/or Florida Universal Financial Corporation, its successors or assigns, will provide one hundred (100%) per cent of the financing required * * *.
As further consideration for the assignment of one-half (½) of the profits * * *, [Schaeffer, Burkett and Florida] will assume all liabilities of H.K. Beebe and W.H. Cox, II, arising from said agreement * * *.
These provisions make it clear that Florida’s status was that of a purchaser of one-half of Cox and Beebe’s interest. The contract shows an intent to bind Florida in a sale and not in a joint venture. Cf. Hauth v. Iacoponelli, 251 La. 410, 204 So.2d 767 (1967); Josephs v. Austin, 420 So.2d 1181 (La.App. 5th Cir.1982), writ denied 427 So.2d 870 (La.1983); Aetna Ins. *715 Co. v. U.S. Fidelity & Guar. Co., 340 So.2d 345 (La.App. 1st Cir.1976).
The second requirement for a joint venture is a sharing of losses. The trial court specifically found that the alleged joint venture failed for this reason. The law is very well settled. Hodges v. Decoteau, 314 So.2d 500 (La.App. 1st Cir.1975), writ denied 320 So.2d 551 (La.1975); Walker v. Delahoussaye, 116 So.2d 884 (La.App. 1st Cir.1959); Beauregard v. Case, 91 U.S. 134, 23 L.Ed. 263 (1875). Under its agreement with Cox and Beebe, Florida was to be responsible for all the liabilities arising from the transaction. This plainly means that if losses occurred, then Florida would have to absorb them all, and Cox and Beebe would be absolved from all. This is not a sharing of losses.
We have conceded that there may have been a joint venture between Lee-Bradley and Estate to obtain the zoning for the PUD. We have also concluded that there was no big three-way joint venture between Lee-Bradley, Cox and Beebe, and Florida. We now hold that any possible joint venture between Cox and Beebe and Florida for the whole PUD project or for the rezoning was likewise impossible because Cox and Beebe were not to share in any losses.
The crucial question concerns Florida’s rights in the second agreement. Florida agreed merely to purchase some interest in exchange for assuming Cox and Beebe’s duty to contribute under the prior agreement. Florida expressly assumed all responsibility for any liabilities or losses arising out of the agreement or development. The agreement is notably lacking in any provision for transferring Cox and Beebe’s security to,Florida in the event the rezoning failed, but Cox, Estate and Beebe have judicially confessed that Florida is entitled to enforce the note. R.p.p. 31, 45.
Florida has cited two cases in which a failure to agree to share of losses was held immaterial. These cases are Amer. Fidelity Fire Ins. Co. v. Atkison, supra, and Fossier v. Amer. Printing Co. Ltd., 130 So.2d 529 (La.App. 4th Cir.1961). We have carefully considered these cases and find them inapposite to the instant case. In both Atkison and Fossier, the problem was that the agreement failed to make any mention of the sharing of losses.[5] The same is not true here. Cox and Beebe not only anticipated losses, but they did everything they could to insulate themselves from losses. Their agreement with Florida specifically frees them from potential liability. Thus Atkison and Fossier are inapplicable. Cox and Beebe’s contractual avoidance of losses is fatal to the alleged joint venture with Florida.
The third requirement is a proprietary interest or a right of control over the enterprise. Unquestionably the December 1972/January 1973 agreement gives Florida an ownership interest, assigning as it does a large portion of the profits to Florida. Florida’s status, however, is strictly that of a purchaser. There is nothing in the agreement to allow Florida to exercise any kind of control and indeed the record shows that Florida never exercised any incidents of control. This requirement is crucial. Westenberger v. State Dept. of Educ., 333 So.2d 264 (La.App. 1st Cir.1976); Marine Services Inc. v. A-l Industries, supra. The absence of usual management powers fortifies the conclusion that Florida was not meant to be a partner.
For all these reasons, we affirm the trial court’s holding that Florida was not a joint venturer with Lee-Bradley, Cox and Beebe.
The remainder of Florida’s specifications of error are predicated on the assumption that there was a joint venture. If there had been a joint venture, then indeed these obligations would attach. LSA-C.C. art. 2809. Since we find none, we will not discuss these arguments.
*716 We will address, however, a factual contention raised by Florida’s fifth specification. Florida claims the trial court erred in failing to find that Cox and Beebe had earned secret profits. This contention is completely unfounded. Both Ronald Jones and W.H. Cox testified that the project produced no profits. R.p.p. 184, 253. Further, there was ample testimony to explain the several promissory notes that went from Lee-Bradley to Estate, Cox and Beebe. These represented security for Estate’s $40,000 loan and parts of the payment for Lee-Bradley’s repurchase of Estate’s interest. Florida’s argument is no doubt based on the observation that the Lee-Bradley notes seem to exceed the reasonable value of the interest repurchased. But we observe that Estate had to bring suit to collect one of these notes, a procedure that would seem hardly necessary if Lee-Bradley had garnered any secret profits.
Florida also suggests that the unused deposits from the options should be subject to an accounting. Ronald Jones testified, however, that in an attempt to salvage the project, he and his brother got extensions on many of the options. These extensions were obtained in exchange for forfeiture of the good faith monies. Thus when the zoning failed the deposits were surrendered. R.p. 183. In addition to no profits, there were no assets remaining, and the trial court’s implicit holding is not manifestly erroneous. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
To summarize, we hold that Florida was never a member of any joint venture with Lee-Bradley because there was no consent flowing between Lee-Bradley and Florida. We hold that there was no joint venture between Florida and Cox and Beebe because their agreement was merely a sale of interest and did not conform to the requirement of a sharing of losses. Finally, Florida cannot claim joint venturer status with anyone because it never received any right of control over the work of either the rezoning or of the entire project. For these reasons, the judgment is affirmed at appellants’ costs.
AFFIRMED.

. On appeal, all the parties urge that this agreement conveyed to Estate an immediate 50% interest in the project.

. ' By this time, Estate had assigned the agreement to Cox and Beebe personally for income tax purposes. R.p. 121.

. By the time of the re-purchase, Ronald Jones was no longer actively involved in Lee-Bradley. He did, however, testify at trial.

. By the time of the litigation, Joe Schaeffer was no longer a shareholder of Florida.

. In Atkison, this was a reasonable omission because the parties contemplated no losses. 420 So.2d at 693.