CARAWAY, J.,
dissenting.
hi respectfully dissent and would reverse the determination that plaintiff proved that the joint venture contemplated by these three parties was ever consummated and carried out so as to bind Liprie for the $4.3 million judgment now rendered against him. Critically, the testimony of the third member of the venture/partnership, Dr. Harrison, with whom the plaintiff also admittedly negotiated, confirms Liprie’s view of the proposed venture. Therefore, Dr. Joyner’s admission that Dr. Harrison was also to be a 25% partner means that the jury, in applying our law for the proof of oral contracts and partnership agreements, was clearly wrong in rejecting Dr. Harrison’s view of the proposed venture/partnership which corroborated fully Liprie’s understanding of the deal.
The majority has properly characterized the disputed contract in this case as “an oral agreement to form a joint venture.” It was executory in nature, meaning that actions or initial contributions had to be fulfilled by the three men to bring them into the proposed contractual arrangement. The jurisprudence has defined a joint venture as “a special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation.” Florida Universal Financial Corp. v. Cox, 493 So.2d 710 (La.App. 2d Cir.1986); Daily States Pub. Co. v. Uhalt, 169 La. 893, 126 So. 228 (1930). The cases have generally assimilated joint venture to the law of partnership. Id. Civil Code Article 2801 defines a partnership as a contract where persons “combine Ltheir efforts or resources in determined proportions ... to collaborate at mutual risk for their common profit or commercial benefit.”
From these principles, it is first most noteworthy that this dispute centers on the formation of the joint venture/partnership and the initial contributions of “efforts and resources,” and not the conduct of the envisioned enterprise from which the parties might have profited. The 25/25/50% split in profits never materialized because these would-be partners never conducted a commercial medical endeavor. They never opened a partnership bank account. This means that there is a lack of any corroborating evidence showing the alleged partnership enterprise being carried out. Instead, the factual search for any corroborating evidence of the two combatants’ opposing views of their oral agreement involves examination *255 of the initial capital contributions which were allegedly being placed into a business that never got off the ground, and most importantly, it involves the consideration of the third partner’s understanding of their contract.
What was each partner contributing to capitalize this venture in early 1994 as they contemplated experimentation of the device in Caracas for the enhancement of the ICRT technology? Liprie’s undisputed contribution was his ICRT patents which had great potential and within two years were sold for $17 million. Dr. Joyner’s view was that he and Dr. Harrison were to contribute their medical expertise and funds to cover Liprie’s expenses and pay him a nominal salary. Dr. Joyner expressed the belief that the “finish line” for the venture would be their successful publication of the Rvital “medical abstract” which would elevate the ICRT technology as a new medical advancement. That view of the “finish line” suggests that Dr. Joyner believed his oral contract to be an executory contract to purchase a 25% ownership interest in Liprie’s patents. In any event, if a partnership was formed on those contributions alone as described by Dr. Joyner, the expected venture might realize profits by either directly marketing the ICRT technology as an ongoing business or by selling the ICRT technology altogether and ending the venture/partnership. With either possible outcome, it cannot be seriously challenged that the primary asset of the joint venture was Li-prie’s valuable technology, and that Drs. Joyner and Harrison would be required to make significant contributions before they would become co-owners of that technology, whether as partners with Liprie in a venture to sell that technology or as individual co-owners with Liprie of the patent rights.
In complete contrast to Dr. Joyner, Dr. Harrison believed that he might only share in the great potential and value of Liprie’s patented device by contributing $1.25 million into the venture in addition to the other contributions identified by Dr. Joyner. From his testimony as a whole, his view was that a marketing company might eventually be their business enterprise, but that a sizeable capital contribution from himself and Dr. Joyner would have been necessary to bring that about so that “profits” through ICRT sales might be realized in the venture and the partners might share those profits in the proportions upon which they all agreed. This $2.5 million in contributions by the two doctors is ambiguously referenced by the |4parties and in the majority’s opinion as “security.” This apparently stems from Liprie’s agreement to allow the two partners to provide some type of letter of credit or “security” agreement, insuring that the $2.5 million was available to the joint venture for the expenses of a marketing enterprise. From a rough measure in July 1994, if the two doctors were making a $2.5-$3 million commitment to capitalize a business upon the anticipated success of Liprie’s yet-to-be proven medical technology as Dr. Harrison believed, the 50/50 split between the inventor and his physician partners for potential profits from those contributions appears economically fair. If the Caracas testing proved unsuccessful, the need for the “security” to proceed with the venture would never materialize and the executory agreement for the venture would end without formation of the partnership and the conduct of any business operation.
Dr. Joyner’s demands for the performance of the obligations of the alleged oral agreement required that he prove the contract. La. C.C. art. 1831. The general principle of obligations over which the parties have argued is contained in Civil Code *256 Article 1846. When a contract is not reduced to writing and exceeds five hundred dollars, “the contract must be proved by at least one witness and other corroborating circumstances.” Id. In a two party oral contract, when A says that B verbally obligated herself in excess of five hundred dollars and B denies it, the two parties’ differing views of their oral agreement offset, and A cannot prevail on his testimony alone.
|5Thus, in this case, the jury, as finder-of-fact, could not decide on credibility grounds alone that Dr. Joyner’s description of the oral agreement to form a partnership would be credited over Liprie’s denial of that agreement. Joyner had the burden of establishing a contract, and it could not be established on his word alone. He had to produce facts beyond his opinion of the verbal deal that match his version of the deal. The jurisprudence holds that Dr. Joyner could be the “one witness” to the oral contract of which Article 1846 speaks, but he needed more. This other corroborating evidence can be either facts concerning the conduct of the parties or another witness. Obviously, if a third person is present and hears the oral contract as the two parties agree to the deal, what is better to serve for proof of the “corroborating circumstances” than the witness who heard the deal? Dennis Miller Pest Controls, Inc. v. Wells, 320 So.2d 590 (La.App. 4th Cir.1975).
In this case, the record presents a thin and ambiguous body of facts of the parties’ communications and conduct before the Caracas trip that fails to establish the initial meeting of the minds which Dr. Joyner asserts. Before the Caracas trip, no significant efforts or resources had been put forth by any of the parties in a venture to establish Liprie’s patents for the ICRT therapy, much less a commercial business. Clearly, it was Dr. Joyner’s word against Liprie’s that an executory arrangement leading to an eventual partnership was firmly in place as a binding agreement to form a partnership.
| (iOn the other hand, Liprie offers an actual witness who heard the deal and, better yet, was an alleged joint obligor/ob-ligee in the venture according to Dr. Joyner’s own admission. Dr. Harrison was a vital party to the Atlanta discussion and the July 15, 1994 letter exchange before the venture ever began with the trip to Caracas. Dr. Harrison’s participation as a partner is a critical admission by Dr. Joyner. Dr. Joyner says he became obligated on an oral contract with Liprie, and vice versa, and he also admits that he simultaneously became obligated to Dr. Harrison, and vice versa, as partners at the same time. While the majority quotes Dr. Harrison’s view of his partnership obligation to pay $1.25 million, it gives it no weight for resolution of the dispute between the other two partners.
The meager body of facts occurring in the brief time window before the beginning of the July 22, 1994 trip to Caracas actually supports Liprie’s and Dr. Harrison’s view of the undertaking. The two versions of the July 15,1994 letter clearly represent the back and forth of the partners in negotiations. The July 15th letter, regardless of which version of the letter is considered, was actually a letter penned for the most part by Dr. Joyner and presented to Li-prie jointly by Drs. Harrison and Joyner concerning their intentions for the undertaking. The majority’s opinion that the initial version of the letter supports Dr. Joyner’s view of a firm contract is not correct. Instead, it shows one proposal in the stage of continued negotiations, and its reference of “security” is unclear. For example, all versions of the letter state the following, indicating that no clear meeting of the minds had been reached:
*257 | Neither of us were willing to proceed with the heart program under the terms that Chris [Verret] last verbally conveyed to Mark on Wednesday July 13, 1994. What we were afraid of was going to Caracas, initiating the trial, paying all expenses, covering your salary, only to have time expire on us in August due to circumstances beyond our control.
[[Image here]]
2. You agree to give us until November 31, 1994, to perfect the security agreement with the Bahamas contract as we continue all efforts to do so ASAP. We will keep you constantly updated on all developments and furnish all documents that we have.
[[Image here]]
We certainly have no guarantee at this time that the project will work out or of the time frame of revenues coming to us if it does work.
[[Image here]]
In closing, both of us would like to thank you for allowing us to participate in the project with you. We realize that you could do it without us. We feel that we have made a significant contribution to the ultimate success of the project by arranging the Caracas site. As we all said last night, in spite of bad past experiences, we all still value friendship and trust. We look forward to a successful and ultimately profitable trip to Caracas.
In Dr. Joyner’s handwritten first draft of this July 15, 1995 letter, he further expressed the parties lack of agreement as follows:
Neither of us are willing to proceed with the heart program under the present agreement or [how] we understand it i.e. we still do not have a final copy from Chris [Verret]. More specifically, we envision proceeding to Caracas and initiating the human trials, paying all expenses, covering your salary only to have time expire in August and due to a technicality beyond our control “pay but not play.”
[[Image here]]
We certainly have no guarantee that the heart project will work and/or the time frame and level of revenues from [it] if it does.
[[Image here]]
I feel very strongly that Chris is out of line now that we have government approval from the Bahamas i.e. all of the anticipated delay in perfecting the security document is due solely to the bureaucratic and legal systems and not due to anything that Mark and I can [illegible].
| sMost importantly, when Liprie faxed his version of the letter on July 19 in response (three days before the trip to Caracas), he is clear that any offer on his part to enter into a joint venture was dependent upon the $2.5 million in capitalization from the two doctors. That written version is not the contract between these parties because it is at variance with the early version of the letter first directed by Drs. Harrison and Joyner to Liprie. Dr. Joyner admits that he refused to sign the letter. Yet, Liprie’s “alteration” of the July 15 letter and proposal therein are confirmed by Dr. Harrison’s testimony as the understanding that he and Liprie consistently maintained for the necessary actions of the two doctors which might lead to formation of a partnership.
From this understanding of the July 15 letter negotiations, we have evidence by both Dr. Harrison and Liprie that they went to Caracas with the $2.5 million obligation squarely on the table, and that ful *258 fillment of that capitalization request was not merely something that Liprie sprang on his physician partners when they got back from the successful testing of the device. Likewise, Dr. Joyner went to Caracas knowing that the proposals of the July 15 letter, which indicated uncertainty and ambiguity from his own draft of the letter, were never accepted by Liprie. He admits that he refused to sign a written agreement of understanding before the Caracas trip and again upon his return in early August. Yet, he did not walk away after these failed negotiations for a partnership. He risked devoting his efforts without a contract, and that does not entitle him to 25% ownership of Lipries’ patents.
|9The majority’s measure of this oral contract solely under Article 1846 is not only inadequate but is also incomplete. As a general principle for obligations, Article 1846 deals with the so-called handshake contract. Yet, this was not a handshake oral contract between Liprie and Dr. Joyner; it was a hand-clasp deal by three mutually obligated partners. Therefore, the articles and cases on partnership must be considered. When other disputes regarding loosely formed partnerships are reviewed, the three keys for a partnership are 1) mutual consent of the partners, 2) sharing of the profits and losses, and 3) each party must have a proprietary interest in the property of the enterprise. Hams v. Wallette, 538 So.2d 728 (La.App.2d Cir.1989); Porter v. Porter, 36,007 (La.App.2d Cir.6/12/02), 821 So.2d 663. The third element here is important because in a short period of time the partnership’s main property became worth $17 million. Liprie’s patents had a great value when these three parties first talked; much more than the contributions that Drs. Harrison and Joyner could ever make to the deal. Again, the July 15, 1994 letter from Drs. Harrison and Joyner to Liprie says, “we realize that you could do it without us.” Even if that was only Dr. Harrison’s opinion, it is not an exaggeration and was clearly reasonable justification for Dr. Harrison’s unequivocal understanding shown by his testimony that he and Dr. Joyner owed $2.5 million.
In summary, this was not a two-party oral contract. The issue of mutuality of consent of all the partners must be weighed, and it weighs two-to-one against the plaintiff. Dr. Harrison’s testimony was reasonable and totally consistent with the facts. Dr. Harrison is more than just a witness to 110a two-party handshake deal. Therefore, when Dr. Joyner admits that Dr. Harrison is a partner, Dr. Joyner’s case fails on the issue of the mutuality of the partners’ understanding of this alleged executory agreement to form a partnership.
Finally, the irony of the majority’s ruling is that it appears to find corroboration of Dr. Joyner’s view that $1.25 million was never his obligation from the testimony of Ms. Biwer from whom he sought $1.25 million. Then, it suggests that the jury found that Dr. Joyner complied with the $1.25 million obligation by engaging Ms. Biwer to provide the money. Yet, in the end, Dr. Joyner has received a judgment recognizing his ownership of 25% of the $17 million patents without ever paying the $1.25 million. At a minimum, the majority should amend the $4.3 million judgment by deducting the $1.25 million which Liprie was never tendered.